# IN THE COURT OF APPEALS OF IOWA

No. 23-0677
Filed February 7, 2024

**RCB PORKERS 4, LLC,**
    Plaintiff-Appellee,

**vs.**

**JERRY SEUNTJENS,**
    Defendant-Appellant.
_____

**SEUNTJENS FARMS,**
    Third Party Plaintiff-Appellant,

**vs.**

**JAMES BOHNENKAMP and SUSAN BOHNENKAMP,**
    Third Party Defendants-Appellees.
_____

Appeal from the Iowa District Court for Plymouth County, Jeffrey A. Neary,

Judge.


A defendant appeals from the district court's judgment that it breached its

contract with plaintiff. **AFFIRMED.**


Chad Thompson of Thompson Law Office, LLP, Kingsley, for appellants.

Justin Vondrak of Crary Huff Law Firm, Sioux City, for appellees.


Considered by Bower, C.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

In this contract dispute, we are asked to decide, "whose price is it anyway?" The parties formed a contract for manure, setting the price at "65% of the commercial fertilizer rate at First Cooperative Association (FCA) of Kingsley, Iowa." When the seller—RCB Porkers 4, LLC—calculated the price based on the public rates given by that cooperative, the buyer—Jerry Seuntjens—refused to pay. He claimed that he could get a better rate from the cooperative than a typical member of the public. And he argued that this lower rate was what he agreed to base the manure price on in the contract.

But contract interpretation is not improv. We must interpret a contract based on its originally agreed terms—not as an evolving scene with terms breathed to life or modified by a party speaking its previously secret intent. And this contract is unambiguous that the manure price is based on "*the* commercial fertilizer rate" at the cooperative—not some special rate available only to Seuntjens. So the district court correctly found that Seuntjens breached the contract when he refused to pay the price calculated based on the rate obtained by RCB Porkers. We thus affirm.

I.

Appellants Jerry Seuntjens and Seuntjens Farms (collectively "Seuntjens") run a farming operation in northwest Iowa. Their farm needs fertilizer. And hog manure works well. Conveniently—at least until this dispute broke out—RCB Porkers has excess manure. It runs a hog facility on land purchased from Seuntjens, right near the farmland that Seuntjens needs fertilized. And the facility needs a place to dispose of all the manure from its hogs. So the parties contracted for RCB Porkers to apply its manure on the farmland for at least twelve years.

The parties agree that the terms of their contract are set out in a written—but unsigned—manure easement and manure application agreement. As relevant here, that document provides:

> [Seuntjens] shall pay [RCB Porkers] or their manure applicator, for the actual amount of manure applied in an amount equal to 65% of the commercial fertilizer rate at First Cooperative Association (FCA) of Kingsley, Iowa, said rate to be determined as of the date the first manure is applied during that time period.

The contract has no other provision addressing the price to be paid by Seuntjens.

It took some time to reach this agreement because RCB Porkers originally wanted Seuntjens to pay 75% rather than 65% of the commercial fertilizer rate. And it wanted to use the average rate from three cooperatives rather than just one. These proposed terms were more consistent with the practices of RCB Porkers' manure applicator in dealing with other landowners. But Seuntjens insisted on using the named cooperative in Kingsley and the greater discount. And the parties eventually reached agreement using Seuntjens's proposed terms.

RCB Porkers first applied its manure under the contract in 2019.[1] To determine its price, RCB Porkers used a lab analysis of samples of the manure to determine the amounts of nitrogen, potash, and phosphorus applied. Then, Seuntjens gave RCB Porkers a rate for each of those commercial fertilizers from the cooperative in Kingsley. Using the rates Seuntjens provided, RCB Porkers calculated the total price with the 65% discount and invoiced him $23,400.36 for the 2019 manure. Seuntjens paid the same.

---

[1] As permitted in the contract, RCB Porkers used a related company—RCB Honey Haulers, Inc.—as its manure applicator. For simplicity, we do not distinguish between the two entities and refer to all actions of either entity or their agents as those of the contracting and litigating party: RCB Porkers.

The parties followed a similar price-calculation process in 2020. But this time, after receiving Seuntjens's fertilizer rates, RCB Porkers asked the parties' mutual banker to check with the cooperative to confirm the numbers Seuntjens provided. The rates directly from the cooperative were "a little bit higher" than those given by Seuntjens. Yet the difference in total price calculated with Seuntjens's numbers still "wasn't very much," likely only a few hundred dollars. So RCB Porkers decided not to raise the issue and used Seuntjens's numbers in its calculation. RCB Porkers invoiced him $20,804.25 for the 2020 manure. And Seuntjens eventually paid that amount without incident.

But the parties' manure arrangement went downhill in 2021. Commercial fertilizer rates at the cooperative skyrocketed that year, with increases ranging from 91% to 225% for each fertilizer by the time the manure was applied. So the $63,433.25 manure price RCB Porkers calculated from these rates likewise reflected these increases.

When Seuntjens received the invoice, he refused to pay it. He told RCB Porkers that he paid a substantially lower rate on the fertilizer from the cooperative just before they applied the manure. And he argued that the manure price should be calculated using this rate he could (and did) get rather than the public one RCB Porkers obtained from the cooperative. He also explained that the rates he had been giving for the calculations the past two years were "the commercial fertilizer price that I can get at" the cooperative. Seuntjens thus ran his own calculations based on the fertilizer rates he could get. And he sent RCB Porkers a check for the amount that he believed he owed: $43,179.82, a difference of over twenty thousand dollars from the amount invoiced.

RCB Porkers refused to accept the lower payment. Instead, it sued. Among other claims, it alleged that Seuntjens breached the contract by not paying the agreed price based on the commercial fertilizer rate. And so it sought payment for that price of $63,443.25 plus interest, court costs, and attorney fees.

While the suit was pending, RCB Porkers refused Seuntjens's request to apply its manure on his farmland again in 2022. Seuntjens then added a counterclaim that this refusal was a breach of contract by RCB Porkers.[2]

After a bench trial in January 2023, the district court found that both parties breached the contract. The court agreed with RCB Porkers' interpretation of the price term, reasoning that the "[t]he phrase 'commercial fertilizer rate' is clear and unambiguous and it clearly means the published price of commercial fertilizer at the FCA in Kingsley." The court thus awarded RCB Porkers $63,443.25 for the unpaid fertilizer applied in 2021. Yet the court also found that RCB Porkers breached the contract by not applying fertilizer for Seuntjens in 2022, awarding Seuntjens $40,949.05 in damages for that breach. Seuntjens now appeals, challenging only the judgment against him for failing to pay for the 2021 fertilizer.

II.

The parties agree that this breach-of-contract claim was tried at law to the district court. So we review for correction of errors at law. *Dolly Invs., LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 173 (Iowa 2023). Typically, we are not bound

---

[2] Seuntjens made the same allegations as third-party claims against the husband-and-wife owners of RCB Porkers. He also claimed that they and RCB Porkers breached the contract by refusing to accept his 2021 payment. And he asked for a declaratory judgment interpreting the price term of the contract. Seuntjens did not succeed on these claims in the district court, and he has not challenged the district court's disposition of them on appeal.

by the district court's interpretation or construction of a contract because "[w]e generally review the construction and interpretation of a contract as a matter of law." *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999). Deciding whether a contract is ambiguous and resolving "any ambiguity in a written contract" without the presence of any relevant extrinsic evidence are also matters of law. *Id.* But if the district court used extrinsic evidence to interpret the contract, "the findings of the trial court are binding on appeal if supported by substantial evidence." *Id.*

Seuntjens only challenges the district court's interpretation of the price term and not the underlying facts or any other element of the breach-of-contract claim. *See Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (discussing breach-of-contract elements). He argues that the court should have decided that the term is ambiguous and relied on the parties' course of dealing in 2019 and 2020 to interpret its meaning. And he contends that if we do so, we should agree with his interpretation that the term means "the commercial fertilizer rate *Seuntjens* would pay at First Cooperative Association (FCA) of Kingsley, Iowa."

When interpreting a contract, the intent of the parties at the time the contract was executed must control. *See Hartig*, 602 N.W.2d at 797. We look for "the parties' *mutual* intent" not "some secret, undisclosed intention they may have had in mind, or which occurred to them later." *Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011) (cleaned up). "[T]he words of the agreement are still the most important evidence of the [parties'] intentions." *U.S. Bank, Nat'l Ass'n v. Bittner*, 986 N.W.2d 840, 848 (Iowa 2023) (cleaned up). But in deciding the plain meaning of those words and whether they are ambiguous, we must consider "(1) the

contract as a whole, and (2) any extrinsic evidence offered by the parties as to the contract's meaning," including evidence of "the course of dealing between the parties." *Id.* at 847–48 (cleaned up). If in context, there remains no ambiguity in a contract term, then the extrinsic evidence cannot be considered "to contradict that term under the facade of interpreting it." *Id.* at 848. "When a contract is not ambiguous, it will be enforced as written." *State Pub. Def. v. Iowa Dist. Ct.*, 594 N.W.2d 34, 37 (Iowa 1999).

Keeping this guidance in mind, we start by seeking to understand the context of the price term offered by the parties. Seuntjens asks us to consider extrinsic evidence of their course of dealing under the manure contract in 2019 and 2020. But it matters not that RCB Porkers held its nose and accepted the slightly lower fertilizer rate numbers given by Seuntjens in 2020 or did not double-check his numbers in 2019. The difference in both the rate and final price calculation in 2020 was minimal—not much more than a rounding error in a substantial, multi-year contract. There is no evidence that the parties discussed the discrepancy or that RCB Porkers would have had any other reason to know that Seuntjens was using his own "price I can get" rather than simply making an error, using a different day's rates, or trying to shave off a few dollars. And so this course of dealing more likely shows that RCB Porkers was making a rational business decision that it was not worth its time to investigate further rather than manifesting any agreement with Seuntjens's interpretation of the term.

Looking at the text of the price term and the contract as a whole, we also see no ambiguity nor any basis for Seuntjens's proposed interpretation. That term setting the manure price at "an amount equal to 65% of the commercial fertilizer

rate at First Cooperative Association (FCA) of Kingsley, Iowa, said rate to be determined as of the date the first manure is applied during that time period" is the only term in the contract addressing the price. And its plain meaning is that the manure price must be calculated from the rate at which the cooperative is selling the commercial fertilizer on the relevant day.

This meaning receives support from a small word punching above its weight: "the." *Cf. Lewis v. Howard L. Allen Invs., Inc.*, 956 N.W.2d 489, 491 (Iowa 2021) (describing "the" as a "small word[]" that "do[es] important work" in giving meaning to a statute). The contract's use of the definite article "the" means that the commercial rate being referred to is a single, particular rate. *See id.* at 491–92. That conflicts with Seuntjens's interpretation of the term, which necessarily relies on there being at least two rates at the cooperative—one for him and one for others. And it would be odd indeed to use the word "the" without some further modifier to specify Seuntjens's private rate from among other rates.

That Seuntjens asks to rewrite the price term rather than just interpret it may perhaps best be seen in the language he uses to describe his preferred meaning. He argues that the term means "the commercial fertilizer rate *Seuntjens would pay* at First Cooperative Association (FCA) of Kingsley, Iowa." (Emphasis added.) But he adds the three italicized words to the actual text of the contract. And it is hard to conceive how one would express his preferred meaning without adding those or some similar words. Nor could we say that any word already in the contract could include in its meaning "that Seuntjens would pay." Without any basis in the contract terms or surrounding context for Seuntjens's preferred meaning, we cannot add it to the contract.

The district court did not err in its interpretation of the price term of the manure contract. Seuntjens was required to pay RCB Porkers for its manure based on "the commercial fertilizer rate at First Cooperative Association (FCA) of Kingsley, Iowa." And in 2021, he did not do so. The district court properly found him liable for breach of contract.

**AFFIRMED.**